IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WILLIAM S. AHOLELEI,<br><br>        Plaintiff,<br><br>   vs.<br><br>DEPARTMENT OF PUBLIC SAFETY,<br>STATE OF HAWAII; JOHN F.<br>PEYTON; FRANK LOPEZ; EDWIN<br>SHIMODA; CLAYTON FRANK;<br>RANDY ASHER; ERIC TANAKA;<br>GARY KAPLAN; MAY ANDRADE;<br>CINDA SANDIN; ATTORNEY<br>GENERAL OF THE STATE OF<br>HAWAII,<br><br>        Defendants. | CIVIL NO. 04-00414 SOM-KSC<br><br>MEMORANDUM IN SUPPORT OF<br>MOTION |
| STATE OF HAWAIʻI, DEPARTMENT<br>OF PUBLIC SAFETY, JOHN PEYTON,<br>FRANK LOPEZ, EDWIN SHIMODA,<br>CLAYTON FRANK, RANDY ASHER,<br>ERIC TANAKA, GARY KAPLAN,<br>MAY ANDRADE, CINDA SANDIN,<br>STATE OF HAWAIʻI ATTORNEY<br>GENERAL,<br><br>        Third-Party Plaintiffs,<br><br>   vs.<br><br>RICHARD CHARLES ROSARIO, JOHN<br>POOMAIHEALANI, DINO KALEO<br>KAUAI, ALLEN A. TAVARES,<br>JEREMY S. CASTRO, STANLEY L.<br>CANOSA, PAUL MOSE TOGIA,<br><br>        Third-Party Defendants. | |

## TABLE OF CONTENTS

<u>Page No.</u>

TABLE OF AUTHORITIES..............................................................ii

STANDARD FOR SUMMARY JUDGMENT ...............................................1

ARGUMENT .....................................................................4

    I.    Advance Notice .......................................................4

    II.   Aholelei's Evidence.................................................10

## TABLE OF AUTHORITIES

<u>CASES</u>

*Addisu v. Fred Meyer, Inc.*
    198 F.3d 1130 (9th Cir. 2000) ........................................................... 2, 3

*Anderson v. Liberty Lobby, Inc.*
    477 U.W. 242 (1986) ........................................................... 3

*Berg v. Kincheloe*
    794 F.2d 457 (9th Cir. 1986) ........................................................... 5, 8

*California v. Campbell*
    319 F.3d 1161 (9th Cir. 2003) ........................................................... 3

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986) ........................................................... 2

*Farmer v. Brennan*
    511 U.S. 825 (1994) ........................................................... 4, 9, 18

*Leer v. Murphy*
    844 F.2d 628 (9th Cir. 1988) ........................................................... 5, 8

*Lewis v. Casey*
    518 U.S. 343 (1996) ........................................................... 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
    475 U.S. 574, 586 (1986) ........................................................... 3, 17

*Nissan Fire & Mariane Ins. Co. v. Fritz Cos.*
    210 F.3d 1099 (9th Cir. 2000) ........................................................... 2

*Porter v. Cal. Dep't of Corr.*
    383 F.3d 1018 (9th Cir. 2004) ........................................................... 2, 3

*Saucier v. Katz*
    533 U.S. 194 (2001) ........................................................... 9

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*
    809 F.2d 626 (9th Cir. 1987)......................................................2, 3, 4


Rules

Fed. R. Civ. P. 56 ........................................................................2


Other

Eight Amendment ...............................................................passim

## MEMORANDUM IN SUPPORT OF MOTION

On December 6, 2005 this Court granted the Defendants' motion for summary judgment in this case. William S. Aholelei ("Aholelei") appealed to the Ninth Circuit which initially affirmed the judgment of this Court, but upon rehearing remanded the case to this court to reconsider the grant of summary judgment on two issues:

1.   The treatment of "advance notification [as] a necessary element of an Eighth Amendment failure-to-protect claims;" and

2.   To consider Plaintiff's proferred documents as evidence for the purposes of ruling on the motion for summary judgment.

This case remains ripe for summary judgment. This Court can, and should, comply with the appellate court's mandate by reviewing the evidence under the refined lens prescribed by the Ninth Circuit. In fact to a large extent, this Court has already made that analysis, albeit without specifying it in the opinion and order of December 6, 2005 and this Court's Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment in *Nesbit v. State of Hawaii* (Consolidated Civil Nos. 03-00455 and 04-00167).

## STANDARD FOR SUMMARY JUDGMENT

Summary Judgment shall be granted when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Porter v. Cal. Dep't of Corr.*, 383 F.3d 1018, 1024 (9th Cir. 2004); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. *See id.* at 323. A moving party without the ultimate burden of persuasion at trial—usually, but not always, the defendant—has both the initial burden of production and the ultimate burden of persuasion of a motion for summary judgment. *Nissan Fire & Mariane Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party must identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323).

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." *Porter*, 383 F.3d at 1024 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.W. 242, 256 (1986). "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *California v. Campbell*, 319 F.3d 1161, 1166 (9th Cir. 2003); *Addisu*, 198 F.3d at 1134 (stating "[t]here must be enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion").

When "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec . Serv.*, 809 F.2d at 631. In other words, evidence and inferences must be construed in the light most favorable to the nonmoving party. *Porter*, 338 F.3d at 1024. The court does not make credibility determinations or weigh conflicting evidence at the summary judgment stage. *Id.* However, inferences may be drawn from underlying facts not in dispute, as well as from disputed facts that the judge

is required to resolve in favor of the nonmoving party. *T.W. Elec. Serv.*, 809

F.2d at 631.

ARGUMENT

I.    Advance Notice

The first issue as framed by the Ninth Circuit regards advance notification

not being a necessary element of an Eighth Amendment Failure to Protect claim.

Although it is technically correct that advance notice to prison officials of a

specific attack or assault is not necessary to make out a failure to protect claim,

notice – or at least knowledge of ambient conditions – certainly enters the calculus

necessary for a finding of deliberate indifference, *vel non*. The law was correctly

stated by this court in the Order Granting Summary Judgment:

> "The Eighth Amendment's prohibition against cruel and
> unusual punishment requires that prison officials take reasonable
> measures for the safety of inmates. *Farmer v. Brennan*, 511 U.S. 825,
> 834 (1994). In particular, officials have a duty to protect inmates
> from violence at the hands of other inmates. *Id.* at 833. A prison
> official violates the Eighth Amendment only when two requirements
> are met: (1) the deprivation alleged is, objectively, sufficiently
> serious, and (2) the official is, subjectively, deliberately indifferent to
> the inmate's safety. *Id.* at 834.
>
> To be liable for failure to prevent harm, a prison official must
> know of and disregard an excessive risk to inmate safety. *Id.* at 837.
> The official must be both aware of facts from which the inference
> could be drawn that a substantial risk of serious harm exists, and he
> must also draw the inference. *See id.* A prison official need not
> "believe to a moral certainty that one inmate intends to attack another
> at a given place at a time certain before [he] is obligated to take steps
> to prevent such an assault." *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th

Cir. 1986). Before being required to take action a prison official must, however, have more than a "mere suspicion" that an attack will occur. *Id.* at 459-60 (summary judgment was appropriate when the plaintiff "failed to come forwards with any facts showing that these defendants had any reason to believe he would be attacked by the assailant").

When, as here, an inmate is seeking damages against a defendant; the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir. 1988). *Leer* explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages." *Id.* When a plaintiff seeks injunctive or declaratory relief a broader, more generalized approach to causation is taken. *See id.* When a plaintiff, however, seeks to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the alleged Eighth Amendment deprivation is more refined:

> '[The court] must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, [the court] must take a very individualized approach which accounts for the duties, discretion, and means of each defendant. . . . Sweeping conclusory allegations will not suffice to prevent summary judgment. . . . The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

*Id.* at 633-34 (citations omitted).'"

It has not been disputed nor has the Ninth Circuit reversed this court's holding that the only individual defendant who might be found to have been liable

as deliberately indifferent, is Gary Kaplan ("Kaplan").  As this court previously

found

In support of their Motion, Defendants provide the sworn declaration of Gary Kaplan, DPS Corrections Supervisor II.  (*See* Defs. Concise Stmt. Of Facts, Ex. B. Kaplan Dec)  Kaplan states that he has been responsible for virtually all housing assignments at HCF since August 2003.  (Kaplan Dec. par. 4.)   Kaplan says that Aholelei's initial housing assignment at HCF was 'routinely made following his initial processing and classification.' Although Kaplan does not identify who actually made Aholelei's housing assignment. (*Id.* par. 5).  Kaplan avers that Defendants Peyton, Lopez, and Shimoda were never involved in the housing assignments of Aholelei or any other inmate.  (*Id.* pars. 3, 6.)  Kaplan further states that Defendants Frank, Asher, and Tanaka were rarely involved in inmate housing assignments, and were not involved in Aholelei's housing assignment.  (*Id.*)  Similarly, Kaplan avers that Defendants Andrade and Sandin had no involvement in Aholelei's housing assignment. (*Id.*)

Kaplan says that it has been HCF prison officials' experience that housing rival gang members together leads to increased violence at the prison.  (*Id.* par. 9.)  Accordingly, it is HCF's policy to separate rival gangs from each other when making housing assignments.  (*Id.*) Kaplan asserts, however, that it has also been their experience that once rival gangs are separated from each other, the separated gang members are no more violent than the prison population in general. (*Id.* par. 10.)  It is Kaplan's 'personal and professional policy never to knowingly place a prisoner in a housing assignment that would place him in an increased risk of harm.'  (*Id.*) par. 11)

Finally, Kaplan states that Aholelei did not, before he was assaulted, alert any prison official that he was afraid of being housed with gang members, or that the believed he might be attacked by prison gang members that he had inadvertently offended.  (*Id.* pars. 7, 8, 12.)  Kaplan says that during the entire year and a half that Aholelei was housed with gang members before he was assaulted, Aholelei never complained, in person or by grievance, to any prison official of his fear for his safety.  (*Id.*)

Aholelei's Opposition does not specifically dispute Kaplan's statements regarding who was responsible for his housing assignment or regarding Aholelei's failure to notify Defendants of his general or specific fears for his safety. Aholelei instead argues again that his claims concern Defendants' alleged failure to protect him. Aholelei contends that a 'reasonable man of average intelligence' would see that the prison's policy of separating rival gang members, while housing non-gang members with the separated gang members, 'is an obvious danger to prisoners.' (Op. par. 67) Aholelei asserts that although he was able to 'precariously co-exist with sep[a]rated concentrated gang members' this does not negate the fact that his living conditions were always 'uncertain and dangerously insecure.' (*Id.* par. 68.) (footnotes omitted)

\* \* \* \*

Aholelei did file grievances while he was housed with the gang members who later assaulted him. But his grievances, which sought a transfer to a minimum security facility, were based on his belief that his classification status justified a minimum custody placement. (*See* Op. Exhs. B-A, B-B, Grievance Nos. 86833 and 92759.) The grievances did not claim or even suggest that Aholelei was concerned for his safety because he was housed with gang members. In fact, Aholelei admits that '[a]s long as [he] went along with their rules, [he] was safe[,]' suggesting that he was not afraid for his safety until the day of the attack. (Compl. Stmt. Of Facts par. 6.)

If Aholelei had notified prison officials of his alleged fears, either in the first year and a half that he was at HCF before the attack, or on the day of the attack, when he was concerned enough about his safety to seek help from an inmate intermediary to apologize to the gang member, officials might have been able to prevent the assault. But Aholelei did not notify officials. They had no notice that he had a well-grounded and specific fear of an impending assault. <u>Without this notice, Aholelei cannot show that Defendants were deliberately indifferent to his fear or that they are liable for failing to protect him</u>. (emphasis supplied)

Applying the individualized inquiry test of *Leer v. Murphy, supra,* it becomes clear, even undisputed, that Kaplan neither knew of nor disregarded an excessive risk of harm to Aholelei. To have been deliberately indifferent, Kaplan would have had to both be aware of facts from which he could draw the inference that there was a substantial risk of harm to Aholelei and that he in fact drew that inference. The inference is not a belief to a moral certainty that one inmate intends to attack another, but it must be more than a mere suspicion. *Berg v. Kincheloe.* Here:

> Kaplan says that it has been HCF prison officials' experience that housing rival gang members together leads to increased violence at the prison. (*Id.* par. 9) Accordingly, it is HCF's policy to separate rival gangs from each other when making housing assignments. (*Id.*) Kaplan asserts, however, that it has also been their experience that once rival gangs are separated from each other, the separated gang members are no more violent than the prison population in general. (*Id.* par. 10.) It is Kaplan's 'personal and professional policy never to knowingly place a prisoner in a housing assignment that would place him in an increased risk of harm.' (*Id.* par. 11.)

> Finally, Kaplan states that Aholelei did not, before he was assaulted, alert any prison official that he was afraid of being housed with gang members, or that he believed he might be attacked by prison gang members that he had inadvertently offended. (*Id.* pars. 7, 8, 12.) Kaplan says that during the entire year and a half that Aholelei was housed with gang members before he was assaulted, Aholelei never complained, in person or by grievance, to any prison official of his fear for his safety. (*id.*)

Aholelei's response was only that housing non-gang members with members of separated rival gangs is such an obvious danger that no more is necessary. On

the other hand, Kaplan specifically addressed that: the incidence of violence between separated gang members and non-gang members is no greater than the incidence of violence within the prison population in general. At first blush, that statement may seem callous: do we have to accept some level of prison violence as acceptable? The answer, in the law at least is, yes.

The Supreme Court of the United States has ruled that prisons are inherently dangerous places. *Lewis v. Casey*, 518 U.S. 343 (1996) That is in no small part because the inmates are anti-social types who cannot function within society. Short of locking all prisoners in solitary confinement, there is no way that prison officials can begin to insure the safety of inmates from violence at the hands of other inmates. Prison officials do have a constitutional duty to protect inmates from assaults by other inmates but only to the extent that their failure to do so would subject the inmate to cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the Untied Sates. Of course, the alternative of placing all inmates in solitary confinement could also be an Eighth Amendment violation. The contours of the prison officials' duty to protect inmates from violence at the hands of other inmates is not rigidly defined, and in fact is defined in the negative, i.e., when the prison official's conduct falls so low as to in fact subject the prisoner to cruel and unusual punishment. *Farmer v. Brennan, supra.*

In considering whether or not Kaplan should have been aware of excessive danger to Aholelei and chose to ignore it, the Court should not lose sight of Aholelei's own admissions regarding his situation immediately before he was attacked.

> "These separated [sic] gang members seemed to have [no] problem with me, even though I am not a gang-member [so] long as I obide [sic] by their rules....As long as I went along with their rules, I was safe."

On this record, it should be completely clear that Kaplan and other state officials were not deliberately indifferent to any excessive danger to Aholelei, because they simply did not know of any such excessive danger, if there were one, which appears doubtful at any time before the event in question. Without deliberate indifference, individually on the part of appropriate prison officials, there can be no Eighth Amendment violation and the case fails. Moreover, Kaplan and the others have shown their entitlement to qualified immunity under the first prong of the *Saucier v. Katz,* 533 U.S. 194 (2001) test.

II.    Aholelei's Evidence

This now leads directly into the second and more serious question raised by the Ninth Circuit and the remand. Do the above found facts stand up, using the above stated summary judgment tests, if this court were to consider the documents – primarily letters and declarations of other inmates – as evidence for the purposes

of the motion for summary judgment?  Again the answer is a resounding yes, but

to arrive at that conclusion, we will examine those documents.

The Ninth Circuit also ordered this court on remand to consider Aholelei's

evidence "in the first instance" although it was presented in inadmissible form.

Defendants submit that this court has already considered that "evidence" in the

cases of *Nesbit v.Department of Public Safety*, Civil No. 04-00167 and *Kotis v.*

*Department of Public Safety*, Civil No. 03-00455 (Consolidated) and found that it

did not give rise to a defense to the State Defendants' Motion for Summary

Judgment on the eighth amendment, failure to protect, issues.  The Ninth Circuit

did not specify what documents Aholelei had submitted that were not fully

considered by this court.  The record, however, discloses that Aholelei filed, on

August 30, 2005, with this court his exhibits:

>             A-1 through A-4
>             B-1 through B-4
>             C-1 through C-3
>             D-1 through D-4
>             E-1 and E-2 and
>             F-1 through F-3

A-1 was a copy of a letter dated July 20, 2003 from Anthony Nesbit to Frank J.
    Lopez, Deputy Director of Corrections.

A-2 was a copy of a letter dated April 4, 2003 from Deputy Attorney General, John
    M. Cregor, Jr. to Anthony Nesbit, rejecting his tort claim for failing to state
    a claim upon which relief could be granted.

A-3 was a copy of a letter dated September 8, 2003 from June Tavares, Health
    Information Branch Administrator to Anthony Nesbit explaining that the
    dental care that he was requested is not available to Halawa inmates.

A-4 is a copy of a Declaration of Anthony Nesbit dated June 17, 2004, authenticating the copies of letters and grievances (apparently B-1 through B-4) submitted to Halawa authorities prior to the attack on Aholelei.

Exhibits B-1 through B-4 are copies of grievances from Anthony Nesbit complaining about the policy of housing separated gang-members with non gang-members.

Exhibit C-1 is an April 23, 2003 letter from Deputy Attorney General Bryan C. Yee to inmate Alden A. Pauline, Jr. responding to Pauline's April 12, 2003 letter.

Exhibit C-2 is a copy of a letter or declaration of Alden Pauline Jr. in which he states that he was beaten by members of the USO Family gang. The date of the document is unclear but it appears to be 24 Jun. '04 – after the incident involving Aholelei.

Exhibit C-3 is a copy of a letter dated August 9, 2004 from inmate Kristopher K. Kealoha To Whom It May Concern. Kealoha states that prison gangs are behind a lot of prison violence and claims that he himself was assaulted and burned on 11-24-02.

Exhibit D-1 is a "Claim for Damages Injury" dated in February, 2003. He included a "Declaration" in which he complained that the policy of housing non-gang-members with separated members of rival gangs was dangerous. Nesbit made a monetary claim of $10,000 and requested his housing be reassigned.

Exhibits D-2 through D-4 are responses to Nesbit's claim contained in D-1 basically denying the claim on the basis that classifications of inmates and responsibility for safety are not grounds for tort-claim relief.

Exhibit E-1 is a copy of a letter from Jerry I. Wilson, acting as attorney for Anthony Nesbit, dated April 4, 2003 and addressed to Nolan Espinda, then Warden at Halawa, basically complaining of Nesbit's housing assignment.

Exhibit E-2 is the Department of Public Safety's response dated May 15, 2003 to E-1.

Exhibits F-1 and F-2 are prison grievances filed by Anthony Nesbit, complaining basically of his housing assignment and that non-gang members are housed with separated members of rival prison gangs.

Exhibit F-3 is a copy of a handwritten Declaration of Anthony Nesbit, dated June 17, 2004 stating that prior to the attack on Aholelei, he sent various letters and confidential letters to prison officials claiming that the policy of housing non-gang-members with separated members of rival gangs was unsafe.
*See* Exhibit List at Docket 26 and Exhibits at Docket 30.

At best, Aholelei's exhibits provide only anecdotal evidence of instances of prison violence. The thrust of the sum total of the documents can be characterized as "it doesn't take a rocket scientist to see that these prison gang-members are dangerous violent individuals and therefore, non-gang members should be separated from them for their own safety." These arguments fail to hold water in the light of the Kaplan affidavit that experience has shown that the instances of violence from separated gang-members upon non-gang-members is no greater than the incidence of violence generally within the facility.

Two factors must be noted: 1) while Kaplan has the full overview, over time, of the situation as an administrator responsible for most of the housing assignments, Aholelei's witnesses can only see and report on their own immediate situation, i.e. anecdotally. 2) the law recognizes that prisons are inherently dangerous and there will be inmate upon inmate violence. Prison officials are not expected to make the facilities 100% safe for all inmates; rather, they are not to be deliberately indifferent to excessive risks of violence. Kaplan is not saying that

non-gang-members are always safe from separated members of rival gangs, but rather, he is saying that the risk of violence to those non-gang-members is no greater than the general risk of violence within the facility.

Turning to Aholelei's documentary evidence:

1.     Nesbit's grievances, letters, and request forms provide no factual support for Aholelei's claim.  (Docket 30, All Exhibits except C-1 through C-3). Nesbit largely relies on the alleged assaults on other prisoners (i.e., Aholelei and Kotis) to bolster his argument.  Although Nesbit alleges that he was "beaten" (Docket 30, Exhibit A-2), he does not establish whether he was beaten because gang members were housed with non-members, or because he personally did something to trigger the attack.  Moreover, it is unclear whether Nesbit alleges to have been "beaten" before the attack on Aholelei.  In any event, he does not say whether he reported the attack and, if so, that he reported it before the Aholelei incident.[1]

2.     William Kotis' unsworn statement (Docket 31, Declaration of Anthony Nesbit, Exh. A-1 to Anthony Nesbit's Motion in Opposition to

---

[1]   Even if the statements made by Nesbit and others conclusorily claim that it is dangerous to house gang members with non-gang-members, their statements do not assert evidence of actual threats or incidents of violence to back up their conclusory assertion.  Prison officials need not, indeed should not, accept prisoners' conclusory opinions on prison sociology, but must base their decisions on actual facts.

Defendant's Motion to Dismiss Complaint [Civ. No. 03-00455 Consolidated and filed as support for Aholelei's Motion in Opposition to Defendants' Motion for Leave to file Third-Party Complaint [Docket 23]) is factually vague. Kotis states only that: "I was threatened with violence constantly by gang members and assaulted twice." (*Id.*) Kotis does not establish whether he was "assaulted" or threatened because gang members were housed with non-members or because he personally did something to trigger the attacks or threats. Kotis' statement suggests that the assaults occurred between September 10, 2003 and November 11, 2003 (*Id.*), but does not state that they occurred before the attack on Aholelei on October 3, 2003. Moreover, it is not clear that he reported the assaults, if at all, before the attack on Aholelei.

 3. Kristopher Kealoha's unauthenticated, unsworn statement is factually vague. Kealoha claims that he was "assaulted and burned." (Docket 30, Exh. C-3). Kealoha does not establish whether he was "assaulted" because gang members were housed with non-members, or because he personally did something to trigger the attack. Kealoha claims the assault occurred on November 24, 2002 (*Id.*), but does not say whether he reported the attack and, if so, that he reported it before the attack on Aholelei.[2]

---

[2] Kealoha's claim to have been assaulted and burned by gang members was the subject of a trial in this Court before Judge Alan C. Kay on April 17, 2007, Civil No. 05-0009 ACK-KSC. Judge Kay found that a) Kealoha had been a

4.    Alden Pauline, Jr.'s unauthenticated, unsworn statement is factually vague. Pauline maintains that he was "beaten and brutally mobbed by 'USO family' inmates as well as correctional officers (affiliated w/ jailhouse gang 'USO')." (Docket 30, Exh C-2). Pauline does not unambiguously establish whether he was assaulted because gang members were housed with non-members, or because he personally did something to trigger the attack. Even if Pauline's statement were construed as showing a connection to his housing situation, Pauline does not indicate whether he was "beaten" before the attack on Aholelei. His statement, after all, was dated June 24, 2004, over eight months after the Aholelei incident. Moreover, although he claims to have "contacted" various prison officials, id., he does not indicate that such reports occurred before the attack on Aholelei, nor does he say what he reported. This ambiguity is fatal, as the burden is on Aholelei to put forth evidence that the State officials (particularly Kaplan) were on notice of the attack on Pauline prior to the Aholelei incident.

None of the above four inmates' statements credibly establish that any of the alleged attacks were due to housing non-gang members with separated rival gang members, as opposed to a personal conflict, nor do they show that any of the

---

member of the same gang as his alleged assailants; b) he was not burned as alleged; and c) Kealoha did not testify credibly. Portions of Judge Kay's Findings of Fact and Conclusions of Law are attached to Defendants' Concise Statement of Fact.

attacks were reported to any prison official before the Aholelei incident.[3]

Although these inmates may attempt to evince a connection between their

"assaults" and their housing situation (see, e.g., Docket 26, Exh. C-2 [Pauline

Stmt.]), they do not actually establish this causal connection. Aholelei'

"evidence," even when taken as the truth and in a light most favorable to him, is

simply too vague and attenuated to allow a jury reasonably to conclude that

defendants were aware of facts from which the inference could be drawn that

housing gang members with non-members created a substantial safety risk to non-

members.[4]

---

[3]   In addition, the record establishes that at least two of the above four inmates, Nesbit and Kotis, were housed in the Halawa high security facility. (*See* Docket 30, Exh. D-1 [Nesbit]; Docket 31, Docket 31, Exh. A-1[Kotis). Aholelei was housed in medium security at Halawa. (ER 1 at 21/CR 1). At best, Aholelei provides "evidence" to show that some non-gang members housed in high security were attacked by high security gang members. Aholelei has produced no evidence to show that gang members classified as medium security inmates inflict violence on non-members. The "evidence" Aholelei sets forth is thus irrelevant on this additional ground. Although it is not clear from their individual statements as to whether Pauline and Kealoha were housed in medium or high security at the time they were allegedly assaulted, it is Aholelei's burden to establish that medium security gang members pose a substantial risk to non-members. The Pauline and Kealoha statements, by being silent on the security status of their attackers, fails to satisfy that burden.

[4]   Aholelei, as the non-moving party, has to show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, he must introduce facts from which a jury can reasonably conclude that the State officials had formed a subjective inference of a substantial risk to prisoner safety. This court previously properly found that a reasonable jury, considering all evidence in the record, simply could

Most significantly, even viewing Aholelei's evidence in the light most favorable to him, the court cannot disregard defendant Gary Kaplan's declaration that, "Our experience [at HCF] is, and has been, that members of prison gangs, separated from members of rival prison gangs, are no more violent than the prison population in general." (Docket 36, Decl. of Kaplan at #10). In sum, the evidence, including the inadmissible evidence, is insufficient to raise a genuine issue that the State officials were aware of facts from which the *Farmer* inference could be drawn.

Moreover, even if this Court were to find the evidence sufficient to raise a genuine issue that an inference could be drawn that housing non-gang members with gang members posed a substantial risk of serious harm, the evidence is uncontradicted that Kaplan did not actually "draw the inference." *Farmer*, 511 U.S. at 837.

The undisputed record evidence establishes that Kaplan was the only named defendant responsible for Aholelei's housing assignment.[5] Kaplan explains the reasoning underlying Aholelei's placement as follows:

> 7.    During the period of approximately one and one-half
> years that Plaintiff was housed in Module 2, I received
> neither complaints as to his housing assignment nor any

---

not return a verdict for Aholelei. There is nothing in the newly considered evidence to change that conclusion.

[5] *See, supra,* Section A, subsection 1 at 18.

notice that Plaintiff was in any particular danger from
other inmates;

    8.    My review of Plaintiff's records further discloses no
notice, grievance, or complaint to anyone that Plaintiff
was in any particular danger, nor had any fear for his
safety in that module.

    10.    On the other hand, our experience is, and has been,
that members of prison gangs, separated from members of
rival prison gangs, are no more violent than the prison
population in general;

    11.    It is my personal as well as my professional policy
never to knowingly place a prisoner in a housing assignment
that would place him in an increased risk of harm;

    12.    In assigning Plaintiff, William S. Aholelei to Module
2, I fully believe that he was not knowingly placed in
Harm's way nor was there ever any notice that Plaintiff was
at any time under an increased risk of harm.

(Docket 36, Decl. of Kaplan)(emphases added). These sworn statements by

Kaplan as to his belief that housing Aholelei with separated, rival gang members

would not pose an increased risk of harm to him, and supported with explanation

and empirical evidence, prove that Kaplan did not actually draw the required

*Farmer* inference. There is simply no evidence in the record to suggest the

contrary. Halawa prison officials addressed each inmate's safety needs and

concerns on an individual, case-by-case basis. *Id.* Aholelei compatibly coexisted

with the gang members in Module 2. In his own words, "These seperated [sic]

gang members seemed to have [no] problem with me, even though I am not a

gang-member [so] long as I obide [sic] by their rules." Additionally, "As long as I went along with their rules, I [w]as safe." (Docket 1, Complaint Statement of Facts #6). There is nothing in the record to indicate that Aholelei, prior to his attack, ever felt threatened by the gang members in Module 2, much less represented to defendants that he felt threatened.

On an individual level, Aholelei gave prison officials no reason to believe his safety was in jeopardy. Aholelei did not recognize, perceive, or report any threat by gang members. In his own words:

> 25. I have seen other non-gang members beaten, extorted and threatened but I didn't think it would happen to me.

*    *    *

> 68. I was fooled by them [the gang members], and they pretended to be my friend and then they try [sic] to kill me.

*    *    *

> 70. I did not expected [sic] to be assaulted by these seperated [sic] gang member's and in that respect I was befriended by them and deceived.

(Docket 27, Plaintiff's Memorandum in Support of Motion in Opposition to Defendants Motion for Leave to File Third-Party Complaint; *see also* Docket 41).

Aholelei remained unafraid until the moment of his attack! All of the evidence taken together leads to the inescapable conclusion that Aholelei's Eighth

Amendment rights have not been violated and the Defendants once again move this Court for Summary Judgment in their favor.

DATED:  Honolulu, Hawai'i, June 2, 2008.

STATE OF HAWAI'I

MARK J. BENNETT
Attorney General

_____
JOHN M. CREGOR, JR.
Deputy Attorney General

_____
CARON M. INAGAKI
Deputy Attorney General

Attorneys for Defendants and
Third-Party Plaintiffs